UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

SAMUEL ISAAC MARQUEZ,

           Petitioner,

   v.

RENEE BAKER, et al.,

           Respondents.

Case No. 3:08-cv-00647-LRH-VPC

ORDER

This counseled habeas petition is before the court for a decision on the merits (ECF No. 19). Respondents filed an answer to the remaining grounds (ECF No. 48), and petitioner Samuel Isaac Marquez filed a reply (ECF No. 51).

**I.     Procedural History and Background**

A jury convicted Marquez of count I: murder with use of a deadly weapon; count II: robbery with use of a deadly weapon; and count III: burglary while in possession of a deadly weapon (exhibits to first-amended petition, ECF No. 19, exhibit 15).[1] The state district court sentenced Marquez as follows: count I – 40 to 100 years; count II – 60 to 180 months plus an equal and consecutive term for the deadly weapon enhancement; and count III – 48 to 180 months, count II consecutive to count I and count III concurrent with count II. Exh. 16.

The Nevada Supreme Court affirmed the convictions on March 22, 2006, and remittitur issued on May 5, 2006. Exhs. 39, 40. Marquez filed a counseled, state

---

[1] The exhibits referenced in this order are exhibits to the first amended petition, ECF No. 19, and are found at ECF Nos. 20 and 35.

1

postconviction habeas corpus petition on March 21, 2007.  Exh. 41.  On October 21, 2008, the Nevada Supreme Court affirmed the state district court's denial of the petition, however it remanded because it determined that the sentence of 40 to 100 years on count I exceeded the permissible sentence for murder.  Exh. 53.  The amended judgment of conviction was filed on November 14, 2008, and amended the sentence on count 1 to 20 to 50 years with an equal and consecutive term for the deadly weapon enhancement.  Exh. 54.  Remittitur issued on November 18, 2008.  Exh. 55.

Marquez dispatched this federal habeas petition for filing on December 16, 2008 (ECF No. 10).  This court appointed counsel, and a first-amended petition was filed on November 24, 2009 (ECF No. 19).  Respondents have now answered the remaining grounds (ECF No. 48).

## II.  LEGAL STANDARDS

### a.  Antiterrorism and Effective Death Penalty Act (AEDPA)

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts

with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the

3

state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

### b. Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id*. To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id*. Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the

4

petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id.*

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted). When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* at 1403 (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards

5

> created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at ——, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at ——, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (internal quotations and citations omitted).

### III.   Instant Petition

In the remaining grounds, Marquez sets forth two claims of ineffective assistance of counsel and one claim of trial court error.

**Ground 1**

Marquez asserts that the trial court refused to instruct the jury on legal insanity in violation of his Fifth and Fourteenth Amendment due process rights (ECF No. 19, pp. 5-9).

This court must consider whether no reasonable jurist could conclude that, viewed in context, the failure to instruct the jury on legal insanity "by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141(1973)).

The trial testimony reflected the following. The owners of a Lake Mead bar received a call in the early hours of December 13, 2001, by the alarm company calling to report that the alarm had gone off at the bar. Exh. 8, pp. 3, 89-106. Ultimately, the couple and a police officer went to the bar and discovered the bartender unconscious, extremely

bloody, and with a head wound.  Surveillance cameras showed a Hispanic man of slight build in a black jacket with a large, white Nike logo on the back had been at the bar, made several unsuccessful attempts to get money from an ATM machine and left.  He returned about six minutes later; the bartender was reading the newspaper.  The man approached the bartender from behind and struck him in the head with a baseball bat.  He struck the victim again after the victim fell to the ground.  He took money from the cash register and left.  *Id.*  The State played the surveillance video for the jury.  *Id.* at 100.

Police used the ATM credit card information to ascertain that it was Marquez's card that was used at the ATM during the time in question.  *Id.* at 106-111.  When police went to Marquez's house several hours later, he answered the door.  He fit the physical appearance of the man on the surveillance video, and he was arrested.  Police conducted a protective sweep of the house at that time and noted a black Nike jacket with a white logo.  *Id.* at 112-115.

Officers brought Marquez to the station and he was read his *Miranda* rights.  He initially claimed that when he left the bar the bartender was there and nothing was wrong.  When he was informed of the surveillance video, he confessed that he had money problems and drug and alcohol problems, that he drank a couple of beers at the bar, went out to his car and concealed a baseball bat, screwdriver and plastic bags on his person, returned and struck the bartender, stole the cash in the register and stole the victim's wallet and left.  Marquez mentioned that he had thought about and planned the robbery, either the day before or earlier that day.  The victim never regained consciousness and died about two months later.  Marquez told police he had not intended to injure the victim so severely.  He said that he knew the law was the law and that what he had done was wrong. Exh. 9, pp. 11-17.  An officer testified that when she told Marquez that if the victim died he would be charged with murder, "he said that he knew that would be right . . . the law's the law."  *Id.* at 14.

Police offers obtained a search warrant and a search of Marquez's car and house yielded a bloody baseball bat, a screwdriver, cash and rolled coins in a plastic bag, and the victim's wallet concealed in the ceiling in the laundry room. A pair of Marquez's pants contained the same credit card that was used at the bar. Exh. 8, pp. 120-125.

Clinical psychologist Mark Chambers testified for the defense at trial. Exh. 10, pp. 5-28. He explained that Marquez's brother had hired him and that based on his examination he concluded that Marquez suffered from paranoid schizophrenia. Chambers also testified that Marquez told him that "for a significant period of time, possibly dating back to childhood," he has experienced visual hallucinations. He would see an apparition of a neighbor who had died when he was a child in El Salvador. He was always very afraid of the vision. The apparition appeared to him at the bar that night and wanted money and he reacted as he did out of fear for his life. *Id.* Chambers testified that he had taken into account possible lying or malingering, but that he believed Marquez was having an episode of psychosis that night in question. *Id.* at 24-25. Chambers opined that Marquez did not consciously consider issues of right and wrong when he acted. *Id.* at 19.

Marquez's counsel presented the following jury instruction for the court's approval:

> Evidence has been presented that the Defendant was legally insane at the time of the commission of the offense. To qualify as being legally insane, a Defendant must be in a delusional state such that he cannot know or understand the nature and capacity of his act, or his delusion must be such that he cannot appreciate the wrongfulness of his act, that is, that the act is not authorized by law.
>
> The burden is upon the Defendant to establish his insanity by a preponderance of the evidence.
>
> If you find the Defendant is legally insane, you must acquit him of the crimes with which he is charged.
>
> Evidence that does not rise to the level of legal insanity may be considered in evaluating whether the prosecution has proven each element of an offense beyond a reasonable doubt for example in determining whether a killing is first or second degree murder.

8

Exh. 19. Defense counsel based this instruction on *Finger v. State*, 27 P.3d 66 (Nev. 2001), and the court took a recess to review that case. Exh. 10, pp. 33-37.

The court then concluded that the instruction was not proper, failed to fully encompass the *Finger* decision and that no testimony supported the instruction. *Id.* The court indicated that it found Chambers' testimony "incredible" and stated: "I just find as a matter of law that the testimony as provided by Dr. Chambers was inadequate to raise the issue of the insanity defense in this case, and for that reason we'll not give an instruction on it." *Id.* at 36-37. The court also refused to give just the last paragraph of the proposed jury instruction, concluding that it was adequately covered by other instructions on intent. *Id.* at 34-35.

In affirming the denial of this claim, the Nevada Supreme Court explained:

> We conclude that the district court committed no abuse of discretion in its refusal of the basic insanity instruction. Marquez's expert opined that appellant was not in a delusional state and likely did not consider, rather than did not appreciate, whether his actions were right or wrong, as required to warrant issuance of this instruction under *Finger* [*v. State*, 27 P.3d 66 (Nev. 2001), *i.e.*, the *M'Naghten* standard].
>
> We also conclude that it was not an abuse of discretion for the district court to refuse the instruction regarding the probative value of evidence of mental illness that does not rise to the level of legal insanity. First, Marquez's statement to police belies his claim that he was mentally ill when he committed the crimes. Second, the district court permitted Marquez to present evidence and closing argument along the lines of the proposed instruction. Third, the jury was instructed on the elements of two types of first-degree murder: (1) that which requires proof of malice aforethought in the killing, and (2) that which requires proof of the killing during the perpetration of a felony. Fourth, the jury was informed that the prosecution must prove all elements beyond a reasonable doubt. Fifth, the jury was instructed that in order to convict on each of the crimes charged, it must ascertain the joint operation of act and intent.

Exh. 39, pp. 5-6.

Marquez has failed to meet his burden here. First, the state supreme court's evaluation that Chambers expressed his opinion that Marquez was not in a delusional state and that he failed to consider, rather than was unable to appreciate, right from wrong, is not unreasonable. *See, e.g.*, exh. 10, pp. 19, 23-24. Second, the jury was free to consider Chambers' testimony with respect to intent and was urged to do so by

9

defense counsel during closing arguments. In the context of this trial, the failure to instruct the jury on legal insanity cannot be said to have, by itself, "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. Accordingly, Marquez has failed to demonstrate that the Nevada Supreme Court's decision is contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Moreover, even if the trial court had erred in not giving some form of the instruction, any error was harmless. *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Marquez confessed, in detail, within hours of the incident to planning to rob the bar and then executing his plan; he expressed remorse and acknowledged that what he had done was wrong, and he never gave any indication that he acted out of fear of a visual hallucination. Chambers' testimony that he believed Marquez's apparition claims, which Marquez first mentioned long after the incident, and disbelieved Marquez's contemporaneous, detailed confession, simply lacked credibility. Federal habeas relief is denied as to ground 1.

**Ground 3(A)**

Marquez claims trial counsel was ineffective when he conceded Marquez's guilt during closing arguments (ECF No. 19, pp. 14-16). He argues that it was only after the trial court rejected the defense's jury instruction on insanity that defense counsel conceded Marquez's guilt.

Counsel's concession of guilt can violate the Sixth Amendment right to counsel when the concession amounts to a total breakdown in the adversarial process such that the State is relieved of its burden of proof. *United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991). Concession of guilt can also be tactical. *Stenson v. Lambert*, 504 F.3d 873 (9th Cir. 2007).

10

In his opening statement, which he delivered after the State rested, Marquez's counsel stated:

> Clearly, this is not a case of whodunit . . . . It is pretty clear that Mr. Marquez did certain things . . . . Rather, this is about what you're going to find is his legal responsibility for what he did . . . . What we don't yet fully know, and we're going to apprise you of this very shortly, is his state of mind . . . . But next we're going to be hearing from a doctor who is going to try to give you more information about what this person's state of mind is.

Exh. 10, pp. 3-4.

In closing, defense counsel acknowledged that Marquez had hit the bartender and robbed the bar. Exh. 10, pp. 54-62. He argued that Marquez ran out of money while at the bar, and only then did he decide to act. He asserted that there was no intent to kill and no premeditation or deliberation. He noted specifically Chambers' testimony about the apparition. *Id.* at 59. Counsel further urged:

> You can . . . consider all of the evidence presented to you, including his mental state, whether you tackle –when you tackle the subject of what was it that he intended to do. Did he have the intention to kill? No. Did he have the specific—as the instructions asked you to find, did he have the specific intent to commit robbery given his mental state? Given his doctor's conclusion about his mental state, that he suffered from a psychosis which he referred to as paranoid schizophrenia, it is likely that he lacked specific intent that the State is asking you to find in the commission of the robbery.

*Id.* at 59-60.

In his appeal of the denial of his state postconviction petition, Marquez relied on *Jones v. State*, 877 P.2d 1052 (Nev. 1994). In that case, the Nevada Supreme Court determined counsel rendered ineffective assistance when counsel conceded guilt during closing arguments after the defendant had pleaded not guilty and had testified at trial that he did not commit the crime. *Jones*, 877 P.2d at 1056-1057.

The Nevada Supreme Court affirmed the denial of Marquez's postconviction petition, readily distinguishing *Jones*:

> During Jones' murder trial, he testified that he never harmed the victim. However, trial counsel's closing argument directly contradicted the

11

>testimony of Jones by acknowledging that the evidence showed Jones killed the victim but argued that Jones was only guilty of second-degree murder.
>
>In the instant case, counsel's closing argument was consistent with appellant's trial strategy to argue that appellant performed the physical act, but that he lacked the necessary state of mind. During the opening statement, counsel informed the jury that they would hear evidence concerning appellant's state of mind and that the jury needed to find that appellant had performed the physical act together with the necessary state of mind to find appellant guilty of murder.
>
>\*\*\*
>
>As counsel was precluded from arguing that appellant was insane during the commission of the crime, he attempted to argue that the mental difficulties Dr. Chambers concluded appellant suffered from should lessen appellant's culpability. Thus counsel's argument was consistent with the theory of defense.

Exh. 53, pp. 4-5.

The Nevada Supreme Court reasonably concluded that defense counsel's tactics and arguments remained essentially consistent throughout the trial. The record belies the claim that his counsel first conceded that Marquez had performed the physical acts during his closing arguments. Marquez, therefore, has failed to demonstrate that the Nevada Supreme Court's decision is contrary to, or involves an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The court accordingly denies ground 3(A).

**Ground 3(B)**

Marquez asserts that trial counsel failed to investigate witnesses—specifically, his brother Abraham Marquez—and endorse them in Marquez's case-in-chief (ECF No. 19, pp. 16-18).

Defense counsel had originally informed the court that the defense had one witness, Dr. Chambers. Exh. 10, p. 32. After Chambers testified, defense counsel sought to call Abraham Marquez as a witness. *Id.* at 29-33. Counsel admitted that he had not endorsed Abraham. He indicated that he wanted to call Abraham to testify that he and

12

Marquez worked at a convenience store, that Marquez had access to fairly significant amounts of cash at the store, that Marquez owed Abraham $3,000, that Marquez had a significant history of drug, alcohol and gambling problems, and that Marquez admitted that what he had done that night was wrong.  Finally, counsel stated that Abraham would be able to explain what he told Chambers regarding his brother's mental health history.  *Id.* at 28-29.

The prosecutor objected that he was not aware Abraham would testify and was unprepared.  He further argued that Abraham's proffered testimony was not relevant and that there was no testimony to corroborate because Marquez hadn't testified.  *Id.* at 29-31.  The state district court agreed with the prosecutor on the basis that the defense had not endorsed Abraham as a witness and he had been present in court throughout the trial and also found that Abraham's testimony would not be relevant or helpful.  *Id.* at 32-33.

In affirming the denial of this claim, the Nevada Supreme Court reasoned:

> Abraham Marquez's testimony concerning appellant's drug and alcohol abuse would have been redundant because Dr. Chambers had already testified concerning appellant's drug use.  Further, appellant did not advance any factual evidence in the district court concerning Abraham Marquez's possible testimony of appellant's mental health history.  In addition, appellant fails to demonstrate that information concerning appellant's debt or his access to money would have had a reasonable probability of changing the results of the trial.  As such, appellant fails to demonstrate a reasonable probability of a different outcome had Abraham Marquez testified at trial.

Exh. 53, pp. 5-6.

As the state courts explained, Marquez has not shown that any of Abraham's proffered testimony had a reasonable probability of changing the result of the trial. Marquez has failed to demonstrate that the Nevada Supreme Court's decision is contrary to, or involves an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Federal habeas relief is denied as ground 3(B).

Accordingly, the petition is denied in its entirety.

## IV. Certificate of Appealability

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

Having reviewed its determinations and rulings in adjudicating Marquez's petition, the court finds that none of those rulings meets the *Slack* standard. The court therefore declines to issue a certificate of appealability for its resolution of any of Marquez's claims.

**IT IS THEREFORE ORDERED** that the amended petition (ECF No. 19) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly and close this case.

DATED this 18th day of March, 2016.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

14